155 So.2d 432 (1963)
A. E. SULLIVAN et al., Plaintiffs-Appellants,
v.
HARTFORD ACCIDENT & INDEMNITY COMPANY, Defendant-Appellee.
No. 9978.
Court of Appeal of Louisiana, Second Circuit.
June 20, 1963.
Rehearing Denied July 12, 1963.
Certiorari Refused October 9, 1963.
*433 Booth, Lockard, Jack, Pleasant & LeSage, Shreveport, for appellant.
Bethard & Taylor, Shreveport, for appellee.
Before GLADNEY, AYRES and BOLIN, JJ.
GLADNEY, Judge.
J. D. Sullivan, his son, A. E. Sullivan, and John Buckholt have instituted this suit for recovery of damages against Hartford Accident & Indemnity Company, the liability insurer of Clyde G. Parker. In a companion suit, Parker et al. v. J. D. Sullivan, 155 So.2d 437, Clyde G. Parker and his collision insurer seek to recover damages sustained by Parker's automobile. The case was tried on its merits with judgment rendered rejecting the demands of claimants herein. From the decree plaintiffs have appealed.
The plaintiffs herein suffered personal injuries when their automobile struck the rear of Parker's automobile which was stopped on a hillside on the Myrtis-Texas Line Road in the northwest portion of Caddo Parish, Louisiana, the accident occurring about 3:30 P.M., September 5, 1962. Shortly prior to the occurrence of the accident Clyde G. Parker, a deputy sheriff residing in Rodessa, Louisiana, received a telephone call reporting an overturned automobile and that the driver of the vehicle could not be located. Parker proceeded to the scene of the accident, surmising from experience that the driver might have been thrown from the vehicle or pinned under it. It was raining as he left Rodessa. He testified he turned on his parking lights which automatically operated additional red warning lights on the front and rear of his automobile with which it was equipped as a safety measure. Parker's car was maintained by the Caddo Parish Sheriff's Department, and was an authorized vehicle for Parker's use as a deputy sheriff, although owned by Parker himself. Parker arrived at the overturned automobile about 3:30 P. M. Rain was still falling and continued for some time.
At that point the highway runs in an east and west direction and asphalt topping had recently been applied to the surface of the highway. The shoulders of the road had not been reconstructed or built up, being several inches lower than the edges of a new asphalt topping, and were ungraded and narrow. Engineers' plats and pictures in evidence depict a level, straight portion *434 of the highway for a distance of some 1,500 or more feet. The elevation of a section of this road between 300 to 700 feet west of the crest of the hill is about ten feet below the elevation of the crest itself. However, it is indicated a motorist traveling east should have observed a vehicle parked as was the Parker vehicle from a distance of over 300 feet.
When Parker reached the place on the highway where the car was overturned, he was headed west. The overturned vehicle lay some short distance south of the surfaced highway, a distance of approximately 185 feet east of the crest of a hill where three driveways were present. Parker testified he slowed down in his right lane, rolled down his window and upon hearing the sound of a horn from the overturned vehicle, he believed there was a person inside the vehicle signalling to him. He proceeded up the hill to its crest, turned around in one of the driveways, returned to the point of collision, and stopped his automobile as close as possible to the overturned vehicle. As parked, his right wheels were a few feet over on the unsurfaced shoulder, the extreme point at which he thought he could safely park thereon, due to the rain and its condition. His testimony discloses that he turned on his left-turn indicator, which caused the lights on the left side of his automobile to flash, got out of his automobile, checked his rear lights, put on his slicker, checked his front lights and then proceeded to examine the wreck. After he had been occupied for several minutes looking into and under the automobile and searching the bushes in the vicinity, he heard noise caused by the collision of the Sullivan car with the rear of his vehicle. He had not seen the Sullivan car prior to the collision.
The two Sullivans, Buckholt and a fourth person, who was not present at the trial, constituted the crew of a drilling rig and because of the rain were returning home from their place of work. J. D. Sullivan was driving with his son seated next to him and Buckholt was seated on the rear seat. J. D. Sullivan testified that as he came over the hill traveling not more than forty-five miles per hour, he realized that the Parker automobile was stopped and obstructing a portion of his traffic lane, and due to the presence of an oncoming automobile which blocked the north lane of the highway, he immediately applied his brakes and skidded about ninety feet to collide with the parked automobile. He stated he first saw the Parker vehicle as he ascended the crest of the hill proceeding east at a point of about 280 feet from the point of collision, but he did not realize the Parker car was stopped until he reached the crest of the hill. He testified further that he did not see any lights burning on the rear end of Parker's automobile, either before or after the accident, although he assisted Parker in pushing the latter's car in order to get the radio to operate. Parker denied this, testifying that there was no need to push the car in order to operate the radio as it had been damaged in the accident. The testimony of A. E. Sullivan generally corroborated that of his father as to distance and speed. He also said that although the front lights of the Parker automobile were burning, he saw none on the rear. This witness testified he first ascertained that the Parker car was stopped from a distance of 180 to 200 feet.
Counsel for the plaintiffs herein contended before the trial court that Parker was not engaged upon an emergency mission, but in the event the court should hold that he was, that then his behavior in parking the vehicle in such a dangerous location constituted "reckless disregard of the safety of others" and he may not be excused from liability with LSA-R.S. 32, Sections 1 and 24.[1] It was also strenuously *435 urged by counsel for the defendant liability insurer that J. D. Sullivan was guilty of negligence due to excessive speed, failure to keep a proper lookout and failure to maintain his car under proper control.
The trial judge concluded that Parker was on an emergency call and that he acted as a reasonable person under the circumstances would have, both with respect to his decision as to whether there was or was not an injured person in or near the automobile, and secondly in parking his automobile as near as possible to the wrecked vehicle, believing he would be required to remove the injured person from the automobile in the rain, and place him in the emergency vehicle. Proceeding further, the judge stated his understanding of LSA-R.S. 32:24,[1] subd. D to be that "drivers of emergency vehicles would be required to make choices in their work; that they remain under a duty to drive `with due regard for the safety of all persons'; and that the statute does not relieve the drivers of emergency vehicles of the consequences of `reckless disregard for the safety of others.'"
He also found that Sullivan approached the crest of the hill on the newly laid asphalt surface of a country road, in the rain, driving at a speed of 40 to 45 miles per hour; that he observed the Parker car as soon as he could have; that he then attempted to stop his automobile and skidded 92 feet on the wet asphalt into the rear of the Parker car; and that Sullivan was not negligent in failing to see what he should have seen or in operating his vehicle at an excessive rate of speed under the circumstances. The court concluded neither Sullivan nor Parker was negligent and rejected the demands of plaintiffs in both cases.
In his consideration of the application of LSA-R.S. 32:24, subd. D to the facts at hand, the judge a quo held that the conduct of Parker was not so unreasonable as to warrant a finding of actionable negligence. He opined that the lawmakers contemplated that drivers of emergency vehicles would be required to make decisions in the performance of their duties, but remain under the duty to drive "with due regard for the safety of all persons"; that the standard of care applicable to the drivers of emergency vehicles is different from that applicable to ordinary drivers; and that the nature of the emergency will have a bearing on the reasonable nature of the acts of the driver of the emergency vehicle.
Under our Louisiana law actionable negligence by the driver of an emergency vehicle may result from either gross or slight fault as defined in LSA-C.C. Art. *436 3556. Gross fault undoubtedly implies wanton or wilful negligence or the "reckless disregard for the safety of others". On the other hand, where the dangerous conduct of the driver of an emergency vehicle is excusable or reasonable, it is not, by definition, "gross fault" or "reckless disregard for the safety of others". The circumstances do not show that Parker's conduct constituted "reckless disregard for the safety of others". It is seriously argued that Parker did fail in his duty to exercise "due regard for the safety of all persons" as required under the statutory provision. We are inclined to agree that liability may be imposed on the emergency driver if the fault arising from his conduct is not reasonably required by the situation of the emergency, and is, therefore, inexcusable. Contra, if the conduct, though negligent, is not unreasonable. As provided in Restatement of Torts, Section 500, the actor's conduct is said to be in reckless disregard of the safety of another if he intentionally does an act or fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize that the actor's conduct not only created an unreasonable risk of body harm to the other but also involves a high degree of probability in that substantial harm will result to him.[2]
*437 Therefore, the primary question seems to be not the exact degree of fault, but whether the dangerous conduct was excusable under the circumstances.
At least two factors should be examined in determining whether a particular dangerous act of a driver of an emergency vehicle is excusable:
(1) The inherent danger of the act of the driver; (2) Whether the dangerous act was necessary to the performance of the emergency function.
We do not find manifest error in the findings of the trial court. Under the circumstances as determined we are of the opinion that the fault of Parker was protected by the provisions of the state highway regulatory statute, LSA-R.S. 32:1, 24, as amended by Acts 1962, No. 310, and he was not guilty of actionable negligence. Nor does the record indicate negligence on the part of J. D. Sullivan.
Accordingly, the judgment from which the plaintiffs have appealed is affirmed at appellants' costs.
NOTES
[1] LSA-R.S. 32:1(1)

"When used in this Chapter the following words and phrases have the meaning ascribed to them in this Section, unless the context clearly indicates a different meaning:
"(1) `Authorized emergency vehicle' means vehicles of the fire department, police vehicles and such ambulances and emergency vehicles of municipal departments or public service corporations as are designated or authorized by the director of the department of highways or by the chief of police of any incorporated municipality."
[1] LSA-R.S. 32:24

"A. The driver of an authorized emergency vehicle, when responding to an emergency call, or when in the pursuit of an actual or suspected violator of the law, or when responding to, but not upon returning from, a fire alarm, may exercise the privileges set forth in this Section, but subject to the conditions herein stated.
"B. The driver of an authorized emergency vehicle may: (1) Park or stand, irrespective of the provisions of this Chapter; (2) Proceed past a red or stop signal or stop sign, but only after slowing down or stopping as may be necessary for safe operation; (3) Exceed the maximum speed limits so long as he does not endanger life or property; (4) Disregard regulations governing the direction of movement or turning in specified directions.
"C. The exceptions herein granted to an authorized emergency vehicle shall apply only when such vehicle is making use of audible and visual signals sufficient to warn motorists of their approach, except that a police vehicle need not be equipped with or display a red light visible from in front of the vehicle.
"D. The foregoing provisions shall not relieve the driver of an authorized vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others."
[2] In comments appended to the text of Section 500 of the Restatement of the Law, Torts, found on pages 1293, 1294 and 1296, the "Unreasonableness of the risk" and "Negligence and recklessness Contrasted", is discussed:

Comment:
a. "In order that the actor's conduct may be in reckless disregard of the bodily security of others, it must not only involve a high degree of probability that death or serious bodily harm will result therefrom, but the circumstances must be such that the risk so created is unreasonable. Exceptional circumstances may make it reasonable to adopt a course of conduct which involves a high degree of risk of serious harm to others. However, conduct which creates so grave a risk cannot be justified as reasonable unless the end, which cannot be gained except by pursuing it, is itself of very great social value. While under ordinary circumstances it would be reckless to drive through heavy traffic at a high rate of speed, it may not even be negligent to do so if the driver is escaping from a bandit or carrying a desperately wounded man to the hospital for immediately necessary treatment or if his car has been commandeered by the police for the pursuit of a fleeing felon. So too, there may be occasions in which action, which ordinarily involves so high a degree of danger as to be reckless, may be better than no action at all, and therefore, both reasonable and permissible. Thus, one who finds another in a lonely place, and desperately hurt, may well be justified in giving him such imperfect surgical aid as a layman can he expected to give although it would be utterly reckless for him to middle in the matter if professional assistance were available. Although conduct to be reckless must be negligent in that it is unreasonable, it must be something more than negligent. It must not only be unreasonable, but it must contain a risk of harm to others in excess of that necessary to make the conduct unreasonable and therefore, negligent. It must involve an easily perceptible danger of substantial bodily harm or death and the chance that it will so result must be great."
g. "Reckless misconduct differs from negligence in several important particulars. It differs from that form of negligence which consists in mere inadvertence, incompetence, unskillfulness, or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency in that reckless misconduct requires a conscious choice of a course of action either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man. It differs not only from the above-mentioned form of negligence, but also from that negligence which consists in intentionally doing an act with knowledge that it contains a risk of harm to others, in that the actor to be reckless must recognize that his conduct involves a risk substantially greater in amount than that which is necessary to make his conduct negligent. The difference between reckless misconduct and conduct involving only such a quantum of risk as is necessary to make it negligent is a difference in the degree of the risk, but this difference of degree is so marked as to amount substantially to a difference in kind."