634 So.2d 1354 (1994)
Jack LASHA and Lillian Lasha, Plaintiffs-Appellants,
v.
OLIN CORPORATION, et al., Defendants-Appellees,
National Union Fire Insurance Company, Intervenor-Appellant.
No. 91-459.
Court of Appeal of Louisiana, Third Circuit.
March 2, 1994.
*1356 Robert W. Thomas, Lake Charles, for Jack Lasha and Lillian Lasha.
Thomas M. Bergstedt, Lake Charles, for Olin Corp.
Charles V. Musso Jr., Lake Charles, for Nat. Union Ins.
Before GUIDRY, LABORDE and THIBODEAUX, JJ.
GUIDRY, Judge.
This case is on remand from the Supreme Court of Louisiana. The facts of this case are fully set forth in the Supreme Court's opinion, 625 So.2d 1002 (La.1993), and in this court's prior unpublished opinion, docket number 91-459, which was rendered on October 6, 1992.
In this case, plaintiff, Jack Lasha, alleged that while working as a truck driver for DSI Transports, Inc., he suffered disabling injury when he inhaled chlorine gas on the premises of defendant, Olin Corporation (Olin). Lasha urged that his injury occurred as a result of Olin's tortious conduct. The trial court, for written reasons assigned, concluded that Lasha did not suffer any injury as a result of his short exposure to chlorine gas. The Supreme Court reversed this court's affirmation of the trial court's judgment.
Primarily, the Supreme Court determined that both the trial court and this court erred in requiring the plaintiff to prove "to a reasonable medical certainty" that his exposure to chlorine gas (because of Olin's fault or defective equipment) caused his injuries. The Supreme Court ruled that, by employing the "reasonable medical certainty" heightened burden of proof instead of the "preponderance of evidence" burden, the trial court applied an incorrect legal principle which necessitated reversal. Further, the Supreme Court determined that Lasha proved by a preponderance of the evidence that his tortious exposure to chlorine gas by Olin was a cause in fact of his injury and his disabling clinical asthma and depression. On remand, the Supreme Court instructed this court to review the record de novo for purposes of awarding damages for Lasha's injuries and disability. We are also to determine whether consortium and exemplary damages are warranted under the facts of this case.

SPECIAL DAMAGES
Lasha seeks the following special damages: past and future medical expenses and past and future lost earnings. Our thorough review of the record reveals that he is entitled to these damages in the amounts set forth below.

Medical Expenses
At trial, by written stipulation, the parties agreed that medical expenses to the date of trial were $45,097.95. This amount was paid by Lasha's worker's compensation insurer, National Union Fire Insurance Company (National), which intervened in this matter to recover these medical expenses in addition to $34,583.97 in weekly compensation benefits. Additionally, Lasha seeks $86,400 in future medical expenses.
The evidence adduced both at trial and during numerous medical depositions preponderates that the amounts spent for Lasha's medical and psychiatric care were reasonable and necessary in light of his primary clinical asthma and secondary depression. Both Dr. Jana Kaimal, his treating pulmonologist, and Dr. D. Dale Archer, his treating psychiatrist, testified concerning the extent, severity and probable causes of Lasha's conditions and outlined their respective treatments to the date of trial. Dr. Archer's conclusions were corroborated by Dr. Lawrence Dilks, a psychologist who performed a battery of psychological tests on Lasha for Dr. Archer, and Robert Walker, Lasha's treating clinical social worker. While most, if not all, of defendant's medical experts expressed skepticism as to the necessity of the extensive treatment rendered, it is clear that Lasha proved the reasonableness and necessity of his past medical expenses by a preponderance of the evidence. Accordingly, we award $45,097.95 in past medical expenses, subject to intervenor's claim for the entire amount. Our judgment will reflect an award in favor of National for $45,097.95 in past medical expenses.
*1357 Plaintiff seeks $9,600 in future pulmonary care expenses and $76,800 in future psychological care expenses. He urges that these amounts are to pay for treatments which will be required over the next 20 years.
Future medical expenses must be established with some degree of medical specificity. An award cannot be based upon speculation. Pitts v. Bailes, 551 So.2d 1363 (La.App. 3rd Cir.1989), writs denied, 553 So.2d 860 (La.1989) and 556 So.2d 1262 (La. 1990). At trial, Dr. Kaimal testified that he had seen Lasha approximately 15 times over the two year, eight month period following his exposure and that he was, at the time, seeing Lasha once a month. On the issue of future pulmonary care, Dr. Kaimal stated:
A. Well, he will need some form of bronchodilator therapy. That is something to keep his bronchial tubes open. I think it is helping. He probably will need antibiotics when and if he gets infections in the bronchial tubes.
* * * * * *
Q. How often are you seeing him now?
A. About once a month.
Q. How long do you think that will continue, that you will need to see him on a monthly basis?
A. Well, if his symptoms are this way, until he decides to find somebody else.
* * * * * *
This is Dr. Kaimal's only testimony concerning future medical care. Dr. Kaimal stated that he charges $46 for a limited visit and $58 for an intermediate visit and that such visits would continue into the indefinite future. In Dr. Kaimal's opinion, at the time of trial, Lasha was totally disabled by his clinical asthma and unable to return to work. The medical evidence also established that asthma is a treatable and reversible condition.
Plaintiff argues that the evidence is sufficient to support a $9,600 award for Dr. Kaimal's care over the next 20 years. We conclude that plaintiff will need such treatment for an extended period of time. Given the facts and circumstances, we feel that an award of $9,600 for future pulmonary care expenses is appropriate and reasonable.
Additionally, plaintiff claims that he will need weekly psychological counseling for the next 20 years at a cost of $76,800.
Dr. Archer, plaintiff's treating psychiatrist, testified that Lasha suffers a mild or major depression caused in part by the physical symptoms resulting from chlorine exposure and in part by the fear that his lung condition will worsen. He stated that, since Lasha's Prozac medication was doubled in June of 1990, Lasha was "doing much better" and that, in the future, he would be seen on a six-month basis. Dr. Archer charges $40 for such a follow-up office visit. Furthermore, he explained that Lasha "... needs continued medication treatment at least for another year, and he needs therapy (by a social worker) to continue for another year, also". Dr. Archer concluded that the probability of recovery from such depression after a year of treatment was good, but he could not say with certainty until Lasha was reevaluated after that year had passed.
Lasha's counselor, Robert Walker, a board certified social worker, testified that he has a weekly session with Lasha at a cost of $85 per session. Both Dr. Archer and Walker stated that these sessions are necessary. There is no other evidence in the record beyond that summarized above which indicates the necessity for and the period of time during which future medical care will be required. In sum, plaintiff's claim that he will need psychological care for 20 years is unsupported by any testimony or evidence in the record.
We conclude that an award of $9,000 for Lasha's future psychological care is adequate. This award for future medical expenses is also subject to National's intervention claim for all medical expenses paid by National from the date of trial to the date of this decision plus medical expenses which National will pay in the future.

Lost Earnings
Dr. Randy Rice, Ph.D., an economics professor at Louisiana State University, testified concerning Lasha's economic loss. Dr. Rice's testimony that plaintiff's past lost *1358 earnings (from April 15, 1988 to the date of trial) amounts to $75,573 is uncontradicted. He arrived at this amount by averaging Lasha's incomes for the years 1984 through 1988. Rice testified that, for the most part, Lasha's income remained relatively constant over this period. He projected Lasha's 1988 income over the balance of the year by averaging his monthly income received during the first three and one-half months of that year. Dr. Rice's calculations of past lost earnings are clearly based upon sound economic principles. We will award Lasha $75,573 in past lost earnings, subject to National's intervention claim for weekly compensation benefits paid to Lasha from his injury to the date of trial.
Future lost earnings, which are inherently speculative, must be proven with reasonable certainty. Purely conjectural or uncertain future lost earnings are not allowed. Smith v. Louisiana Farm Bureau Casualty Insurance Co., 603 So.2d 199 (La. App. 3rd Cir.1992), writ denied, 605 So.2d 1115 (La.1992). Dr. Rice testified that the present value of Lasha's future lost earnings is $386,613. He determined that Lasha's work life expectancy, derived from U.S. Department of Labor statistical tables, was 151/3 years. He also assumed that Lasha was totally and permanently disabled and would be unable to return to work. He projected that the cost of living would increase approximately five percent annually and that Lasha would receive a six percent annual raise. The gross income was then discounted at the rate of eight and one-half percent to arrive at the present value of $386,613. Additionally, Dr. Rice stated that if Lasha were able to start a minimum wage job beginning January 1, 1991, the present value of that job would be $101,671. This would make his net future lost wages $284,942.
Glenn Hebert, a vocational rehabilitation specialist, testified that, without regard to any physical disability, Lasha could work as a warehouseman, a light delivery driver or in a convenience store or parts house. The pay for this type of work would be $3.80 to $4.50 per hour. Given his limited education and intellectual ability, Lasha would have no chance to advance to a management position. Hebert conceded that, given Lasha's prior medical and work history, most potential employers would be reluctant to hire Lasha. In reality, although he may one day be capable of working, Hebert opined that it may be difficult for him to find work because of his condition.
Considering Lasha's disability and his limited intellectual ability, his chance of obtaining employment when and if he recovers is marginal at best. Therefore, based upon Dr. Rice's testimony, we award Lasha $386,613 for his future lost earnings. This award is subject to National's intervention claim for reimbursement of weekly compensation benefits paid, if any, from the date of trial to the date of this opinion and any such benefits to be paid in the future.

GENERAL DAMAGES
In personal injury actions, each injury must be evaluated according to its own peculiar facts and circumstances and its effect upon the particular injured party. Richard v. Walgreen's Louisiana Co., 476 So.2d 1150 (La.App. 3rd Cir.1985). The plaintiff has the burden of proving damages claimed by competent evidence. Hargroder v. Protective Life Insurance Co., 556 So.2d 991 (La.App. 3rd Cir.1990), writ denied, 559 So.2d 1367 (La.1990). In assessing damages, the court's primary considerations are the severity and duration of the elements of damage claimed by the plaintiff. Holt v. Rapides Parish Police Jury, 574 So.2d 525 (La.App. 3rd Cir.1991).
The Supreme Court concluded that, through the fault of Olin or its defective equipment, Lasha was exposed to chlorine gas which caused his previously subclinical asthma to become clinical. In other words, the exposure aggravated a preexisting but mostly dormant condition. The court also concluded that his chronic bronchitis, which was caused by 25 years of daily cigarette smoking, was also aggravated by the chlorine exposure. Additionally, Lasha suffers from mental depression which is directly related to his physical ailments.
Lasha testified that he is unable to do anything except lay on the floor and watch *1359 television. He stated that he experiences shortness of breath and his lungs hurt constantly. He occasionally coughs up blood. Despite these physical symptoms, Lasha began smoking again approximately ten months after the inhalation of chlorine. He stated that he is unable to work, perform any household chores, or engage in leisure activities such as dancing or playing sports with his children. Furthermore, he claims to be depressed to the extent that he has contemplated suicide. He fears that his lung condition will get worse with time and that he will eventually die of lung cancer. Lasha's testimony was generally corroborated by that of his wife, Lillian.
Dr. Kaimal testified that Lasha's lung condition required hospitalization once in January of 1989 for four to five days. During his treatment of Lasha, Dr. Kaimal noted a reduction in his forced vital breathing capacity. All of his pulmonary function studies showed below normal results. Lasha was only able to extract 14.2 cubic centimeters of oxygen per kilogram per minute from his lungs. Dr. Kaimal explained that if this figure is not greater than 15, then the patient is unable to do most jobs. He further stated that he explained to Lasha that his fear of lung cancer is unwarranted and that he was in no real danger of contracting this deadly illness. Dr. Kaimal concluded that plaintiff's sole disabling physical factor is asthma, and that the prognosis for improvement is unclear. At the time of trial, Dr. Kaimal opined that Lasha would not be able to work at any time in the foreseeable future.
Dr. Archer testified that, after a mild or major depressive episode triggered by chlorine exposure, plaintiff is doing well on psychiatric medication. He further stated that, from a purely psychological standpoint, it would be good for Lasha to return to work.
Robert Walker, plaintiff's counselor, explained that Lasha is recurrently frustrated with his inability to be active. Walker observed no evidence that Lasha was faking or exaggerating his physical or mental symptoms. According to Walker, the intensity of Lasha's depression correlates with the intensity of his physical pain complaints.
Based on the above testimony, it is clear that Lasha is totally disabled. It is unclear whether his disability, both physical and mental, is permanent. Credible medical testimony in the record indicates that plaintiff's asthma is treatable and reversible. Additionally, as discussed supra, the psychiatric experts testified that his depression is getting better and that he would need further treatment for one year.
Under the particular facts and circumstances of this case, an award of $350,000 for Lasha's past and future physical and mental pain and suffering is reasonable and appropriate.

LOSS OF CONSORTIUM
In personal injury actions, damages may include loss of consortium, service and society. La.C.C. art. 2315. According to Lillian Lasha, her husband no longer performs any household chores or maintenance as he did prior to the February 2, 1988 inhalation of chlorine gas. Only occasionally does he fish or feed the animals. She and Jack do not get along well anymore since he is at home all of the time. Lillian stated that Jack lays on the floor and watches television for the entirety of the day. She feels like everything is being put on her back and is unhappy about having to do all of the work.
She did not testify as to any changes in their sex life. Plaintiff testified that his sex drive has been reduced to "zero" since the exposure. However, Olin presented the testimony of Dr. Richard Alderson, a urologist, who stated that he examined Lasha five days prior to the incident. Lasha complained to Dr. Alderson of episodes of impotence at that time.
The evidence of Lillian's loss of consortium, service and society, while uncontradicted, is also somewhat sparse. We conclude that an award of $25,000 is appropriate.

EXEMPLARY DAMAGES
Plaintiff seeks to recover exemplary damages from Olin pursuant to La.C.C. art. 2315.3 which, in pertinent part, provides:
In addition to general and special damages, exemplary damages may be awarded, *1360 if it is proved that plaintiff's injuries were caused by the defendant's wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances. (emphasis ours)
In Cates v. Beauregard Electric Cooperative, Inc., 316 So.2d 907, 916 (La.App. 3rd Cir.1975), aff'd., 328 So.2d 367 (La.1976), cert. den., 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976), this court gave meaning to the terms "wanton" and "reckless" as follows:
The terms "willful", "wanton", and "reckless" have been applied to that degree of fault which lies between intent to do wrong, and the mere reasonable risk of harm involved in ordinary negligence. These terms apply to conduct which is still merely negligent, rather than actually intended to do harm, but which is so far from a proper state of mind that it is treated in many respects as if harm was intended. The usual meaning assigned to do the terms is that the actor has intentionally done an act of unreasonable character in reckless disregard of the risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. It usually is accompanied by a conscious indifference to consequences, amounting almost to a willingness that harm should follow. (citations omitted)
The plaintiff must prove that Olin's misconduct was committed with the state of mind that Olin knew the public safety was at risk or should have known that it was highly probable that harm to the public would result from its acts or omissions. Griffin v. Tenneco Oil Co., 531 So.2d 498 (La.App. 4th Cir. 1988), writ denied, 534 So.2d 430 (La.1988). Defendant's derelictions must be accompanied by a "conscious indifference to consequences amounting almost to a willingness that harm to the public safety would follow." Fuselier v. Amoco Production Co., 607 So.2d 1044 (La.App. 3rd Cir.1992), citing Griffin, supra.
The evidence indicates that, upon entry to the Olin facility, all visitors/invitees are given an air mask with a five minute supply of compressed air. All Olin employees are also required to have these devices on their persons at all times. Additionally, all truck drivers and other contract workers are required to watch a film demonstrating how to operate the respirators. The film must be rewatched once every 60 days. The evidence indicates that plaintiff was knowledgeable in how to use his air mask.
At the time of the chlorine leak from the Trichloroisocyanuric acid (TCCA) plant, plaintiff and Rodney Bimle, an Olin operator, were unloading DNT from plaintiff's tank truck at the DNT facility. The TCCA plant is approximately 300 to 400 feet east of the DNT area. The TCCA plant manufactures a dry bleach, sodium hypochlorite, commonly used in swimming pools. The bleach is manufactured using chlorine which is brought into the plant by rail car.
On the night in question, Ronald Chauvin, a relief operator, was unloading chlorine from a tank car in the TCCA plant area when he detected a leak in one of Olin's block valves. This leak did not escape into the air but was pulled into the "vent header system", which is designed to trap chlorine before it escapes and route it back into the manufacturing process. Chauvin corrected the leak in the block valve and reported the leak to Charles McBride, the TCCA plant shift supervisor. McBride left his post to help Chauvin and, while out on the plant grounds, he saw and heard a "dip leg" on the 2C9 tank blow a water seal. McBride opined that the increased amount of chlorine in the vent header system caused a loss of vacuum which, in turn, caused the water seal to burst. At this point, McBride radioed to Sarah Ellzey, the Board operator, and instructed her to declare a Code I release. All areas of the plant were then put on alert through use of the Emergency Radio Frequency. A Code I release means the leak is not expected to leave the unit or plant within which it occurs. McBride then filled the dip leg with water and resealed the system. This minor repair took no longer than five minutes, and he did not require an air mask because the chlorine fumes were not very strong.
However, the loss of vacuum which caused the dip leg seal to give way also caused a *1361 larger than normal amount of chlorine to be injected into the sodium hypochlorite manufacturing process. As explained by McBride, when excess chlorine is pumped into the system, then an equal amount of excess caustic (the other major component) is also automatically pumped in to keep the finished product from deviating from production specifications. The resulting sodium hypochlorite overproduction in the 2C4 tank caused a substantial amount thereof to automatically overflow onto a concrete slab and into a lime ditch. Sodium hypochlorite is approximately four and one-half to six percent chlorine, about the same concentration as household chlorine bleach. It has a pH of 11, which is very basic in nature.
The lime ditch into which the sodium hypochlorite was dumped contained primarily demineralized water (neutral pH of 7), used to produce steam in industrial boilers, which flowed by at 1800 gallons per minute. Plaintiff and Bimle testified that the chlorine smell emanated from the lime ditch just north of the DNT unit. Apparently, the sodium hypochlorite, while dissolved in the demineralized water, came into contact with an unknown acid (pH of less than 7) and released chlorine gas into the air. This is what Lasha and Bimle inhaled. Lasha claims that he used his air mask, but Bimle did not recall seeing Lasha do so. Both men were treated at the first aid station with oxygen, throat lozenges and cough syrup.
Although Olin's conduct is properly characterized as negligent for allowing the sodium hypochlorite to flow into the lime ditch and eventually release chlorine gas, its actions were clearly not with wanton and reckless disregard for public safety. The safety procedures employed were numerous. It cannot be said that the malfunction and Olin's reaction thereto was done with a willingness that harm to the public would follow. Additionally, with each successive leak, immediate action was taken to contain and correct the problem. Warnings were radioed throughout the plant. When plaintiff first breathed chlorine, he failed to immediately utilize his respirator as he had been instructed to do by Olin. Granted, this was an unfortunate series of "domino" events which led to Lasha's inhalation. However, Lasha failed to show that Olin acted or failed to act with a conscious indifference to the safety of the public amounting to a willingness to do harm. For these reasons, exemplary damages are not warranted in this case.

CONCLUSION
For the above and foregoing reasons, we render judgment in favor of plaintiffs, Jack and Lillian Lasha, as follows:

JACK LASHA
SPECIAL DAMAGES:
 (1) Past Medical Expenses $ 45,097.95
 (2) Future Medical Expenses 18,600.00
 (3) Past Lost Earnings 75,573.00
 (4) Future Lost Earnings 386,613.00
GENERAL DAMAGES 350,000.00
 __________
 Total Award $875,883.95
LILLIAN LASHA
LOSS OF CONSORTIUM 25,000.00

We also recognize the intervention claim of National Union Fire Insurance Company and render judgment in its favor for $79,681.92, to be paid out of the amount awarded plaintiff, Jack Lasha, and in preference to him. This amount constitutes medical expenses and weekly compensation benefits paid by National Union Fire Insurance Company from the date of injury to the date of trial. Additionally, National Union Fire Insurance Company shall be paid in preference to plaintiff, Jack Lasha, and reimbursed from the above "total award" for any medical expenses *1362 and weekly compensation benefits paid on behalf of or to him from the date of trial to the date of this decision and continuing into the future.
Costs of this appeal are to be paid by defendant, Olin Corporation.
THIBODEAUX, J., concurs in part, dissents in part and assigns reasons.
THIBODEAUX, Judge, concurring in part and dissenting in part.
I concur with the majority in the awards of special damages to the plaintiff and also concur in the award of the loss of consortium damages to Mrs. Lasha. Those awards are reasonable and are fully supported by the record.
I respectfully disagree, however, with the amount of general damages awarded to the plaintiff and the refusal of the majority to award exemplary damages.
The plaintiff is a relatively young man in his late thirties who will essentially lead a non-functional life. It is undisputed that he is totally disabled and will have to live with his chronic bronchitis and asthmatic conditions as well as his mental depression which has resulted from his physical ailments. He has been deprived of the opportunity to fully enjoy his family environment and the pleasures of life. The record is replete with the problems he will have to undergo and endure. At a minimum, an award of $750,000.00 in general damages should be given as compensation for the plaintiff.
Olin classifies this emission as a Code I release which is an emergency release in an immediate area and which is not expected to leave the industrial plant environment. There is some dispute in the record regarding whether this Code I release was ever reported to the proper authorities. At any rate, this release was of sufficient severity to completely disable Mr. Lasha. In a five year period from January 1985 to February 1990, Olin experienced 548 reported emergencies resulting from various toxic releases. Of this number, 349 were Code I releases. A toxic or hazardous emission, according to Olin's records, occurred every 3.3 days in this five year period. In my view, that demonstrates "wanton and reckless disregard for public safety in the ... handling ... of hazardous or toxic substances" sufficient to justify an award of exemplary damages under La.Civ. Code art. 2315.3. It manifests an indifference to the consequences of these dangerous releases. These releases are of such frequency that it is highly probable that harm would follow to the public if these releases were not sufficiently contained or if steps were not taken to minimize the number and severity of these emissions.
Exemplary damages are intended as a punitive measure to penalize egregious conduct and to deter the possibility of future illicit behavior. It is especially significant in the context of this case, given our society's concern over the quality of our environment and the lethal risks posed by the release or discharge of toxic or hazardous substances. It is imperative that our industries become more concerned with the quality of that environment and the safety and well-being of the public. The attention of a recalcitrant industrial concern like Olin should be awakened. An economic disincentive, it seems, is the only vehicle to achieve this purpose. An exemplary damage award of $3,000,000.00 would be appropriate under the circumstances and would, I think, place Olin and other industries on notice that more serious consideration should be given to the manner in which toxic and hazardous substances are handled. Until that is accomplished, our courts will continue to grapple with attempts to reconstruct lives which have been dramatically altered by callous indifference to the health of our citizens.