688 So.2d 75 (1997)
Lois ADAMS, et al.
v.
MARATHON OIL COMPANY.
No. 96-CA-693.
Court of Appeal of Louisiana, Fifth Circuit.
January 15, 1997.
*76 Joseph M. Bruno, David S. Scalia, New Orleans, for Plaintiffs/Appellants.
David L. Carrigee, Andrew C. Wilson, Donna A. Mannina, New Orleans, for Defendant/Appellee.
Before BOWES, WICKER and GOTHARD, JJ.
WICKER, Judge.
This appeal arises from a class action suit for damages. Plaintiffs alleged they were injured by the defendant Marathon Oil Company (Marathon) when Marathon negligently released ethyl mercaptan on August 22, 1991 in a wanton and reckless manner. Causation and individual damages were tried for twelve plaintiffs identified as the "Bellwether Plaintiffs" who were selected by the parties as representative class members. The trial judge granted judgment in favor of the plaintiffs and awarded damages ranging from $0 to $500.[1] He denied the claim for punitive damages under La. Civ.Code art. 2315.3.[2] The plaintiffs appealed on the issues of quantum and the denial of their claims for punitive damages. Marathon has filed an answer to the appeal. We affirm.
We note at the outset that Marathon has answered the appeal specifying as error the trial judge awarded excessive damages. However, Marathon has not briefed the alleged error of excessive awards. Additionally, Marathon, in its subsequently filed appellee brief, states:
Marathon submits that the trial court did not abuse its discretion by awarding the bellwether plaintiffs awards ranging from $-0- to $500.00 and that the trial court properly denied all claims for punitive damages. For these reasons, the trial court's judgment should be affirmed [emphasis in original.]
We consider Marathon's specification of error abandoned. Uniform RulesCourts of Appeal Rule 2-12.4;[3]Milton v. Elmwood Care, Inc. 95-442 (La.App. 5th Cir. 10/31/95) 664 So.2d 503, 508.
The trial judge made the following factual determination on liability:
the Court finds that the defendant [w]as negligent in its disposition of Ethyl Mercaptan on August 22, 1991. MARATHON decided to dispose of the Ethyl Mercaptan contained in a storage tank because it was emitting odor in the plant which was unacceptable to plant personnel. Ethyl Mercaptan is an odorant used in the transportation and distribution of natural gas. Ethyl Mercaptan is readily detectable by the human nose in very small quantities. In high quantities it is offensive and can cause nausea and headaches. Federal regulations require Ethyl Mercaptan to be added to natural gas before distribution of gas as a safety device. Natural gas is odorless and colorless, but highly explosive. Ethyl Mercaptan is the warning agent added to natural gas to give it smell. When a person thinks they are smelling natural gas they are actually smelling trace amounts of Ethyl Mercaptan.
The method used by MARATHON to dispose of the Ethyl Mercaptan was to drip liquid Ethyl Mercaptan into an open *77 drainage sump where it was mixed with water and then pumped into the refineries [sic] sewerage treatment plant. The water was introduced into the sump by a high pressure fire hose. The dripping of the Ethyl Mercaptan combined with the high pressure water release created a condition which allowed large portions of the Ethyl Mercaptan to evaporate into the atmosphere in levels substantial enough to create an offensive odor in the refinery and in some adjacent neighborhoods.
According to the plant manager, Mr. George Lowe, the environmental engineer and the maintenance department at MARATHON that coordinated the disposition of the Ethyl Mercaptan miscommunicated with regard to the amount of Ethyl Mercaptan that was contained in the storage tank. Because of this miscommunication or misinformation the method of disposal of the Ethyl Mercaptan was inappropriate given the volume present.
The wind conditions on August 19th were such that the gaseous Ethyl Mercaptan dispersed in a Southwestern direction creating a plume which covered most of Garyville and a portion of Edgard. Numerous residents of Garyville became concerned when they noticed a foul odor.
Hilton Mitchell, the Principal at the Garyville Elementary School, smelt a foul odor, experiencing burning eyes and began feeling nauseated. He called the MARATHON REFINERY at 9:30 a.m. to inquire as to the cause of the smell. He was told that the refinery was cleaning a tank and that neither he nor his students at the school were in any immediate danger. Because of the offensive odor he ordered that all doors and windows to the school be closed and turned off the school's air conditioning. He then notified the School Board and the Civil Defense Department and awaited possible evacuation orders. The MARATHON refinery called him back at 9:40 a.m. indicating that the material was nontoxic and no evacuation would be necessary. No students or school personnel were evacuated, however, recess was canceled for all classes and all teachers were advised to stay indoors with their students. Mr. Mitchell indicated some students became ill, but gave no specific examples.
Marathon did not appeal the finding of liability. The plaintiffs seek an increase in the damage award as well as punitive damages.

PUNITIVE DAMAGES
The trial judge denied the claim for punitive damages for the following reasons:
The Billiot [v. B.P. Oil Company, 93-1118 (La.9/29/94) 645 So.2d 604] opinion states clearly that the plaintiffs in order to recover under Article 2315.3 must prove that the defendant proceeded in disregard of a high and excessive degree of danger either known to him or apparent to a reasonable person. Wanton or reckless conduct must be extreme disregard from ordinary care in a situation where a high degree of danger is apparent. "Punitive damages are not authorized ... (in) cases in which the defendant's misconduct is not so aggravated outrageous as to rise to the level of wantonness or recklessness." Billiot supra pp. 617-618.
Other Appellate Courts have sought to define wanton or reckless disregard. In Fuselier vs. Amoco, 607 So.2d 1044 (La. App. 3rd Cir.1992), the 3rd Circuit found that wanton or reckless disregard for public safety must be conscious indifference to consequences amounting to almost a willingness that harm to the public safety will follow. A similar standard was adopted in Lasha vs. Olin Corporation, 634 So.2d 1354, (La.App. 3rd Cir.1994). The terms wantonness or recklessness applies to conduct which is so far from a proper state of mind that it is treated in many respects as if harm was intended or so obvious that defendant must have been aware of the high probability that harm would follow. See, Cates v. Beauregard Electric Co-op., 316 So.2d 907, 916 (La.App. 3rd Cir.1975).
The Mercaptan release in this case was caused by the negligent planning and/or operation of MARATHON employees. There is, however, no evidence of aggravated or outrageous conduct arising to the level of wantonness or recklessness. *78 Therefore, the claim for punitive damages is denied.
Appellants argue the trial judge was manifestly erroneous in finding that Marathon did not act with wanton and reckless disregard for the public safety in handling ethyl mercaptan. They rely on the testimony of Lisa Kraft who testified that ethyl mercaptan is a hazardous substance and that the methods of disposal were by disposal in concrete or incineration. They also argue that the defense's expert, Dr. William George, a toxicologist, testified that the chemical can be fatal in a large concentration. However, Dr. George also stated that from the perspective of a toxicologist, large concentrations of salt or sugar would be classified as "poisons" as well.
Appellants argue there is no question the chemical is hazardous. The question is whether Marathon disposed of it with wanton and reckless disregard for the public safety. In particular, they argue Marathon had knowledge the chemical was hazardous and the options available for disposal. They rely on the cases of Griffin v. Tenneco Oil Company, 531 So.2d 498 (La.App. 4th Cir.1988), Landry v. Uniroyal Chemical Company, Inc., 653 So.2d 1199, 1205 (La.App. 1st Cir. 1995) and Lasha v. Olin Corp., 91-459 (La. App. 3rd Cir. 3/2/94) 634 so.2d 1354, 1360. That line of cases followed Cates v. Beauregard Elec. Coop., 316 So.2d 907, 916 (La.App. 3rd Cir.1975), aff'd 328 So.2d 367 (La.1976), cert. denied, 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976).
In Cates, supra the third circuit explained the terms, "willful," "wanton," and "reckless" at 916 as follows:
The terms `willful', `wanton', and `reckless' have been applied to that degree of fault which lies between intent to do wrong, and the mere reasonable risk of harm involved in ordinary negligence. These terms apply to conduct which is still merely negligent, rather than actually intended to do harm, but which is so far from a proper state of mind that it is treated in many respects as if harm was intended. The usual meaning assigned to do [sic] the terms is that the actor has intentionally done an act of unreasonable character in reckless disregard of the risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. It usually is accompanied by a conscious indifference to consequences, amounting almost to a willingness that harm should follow. See Prosser, Law of Torts, Section 34, at pages 187-189 (od Ed.1964). See also Sullivan v. Hartford Accident & Indemnity Company, 155 So.2d 432 (La.App. 2d Cir.1963); Lipscomb v. New Star World Publishing Corporation, 5 So.2d 41 (La.App., 2nd Cir. 1941); Jefferson v. King, 12 La.App. 249, 124 So. 589 (2d Cir.1929).
Cates, supra occurred before the enactment of La.Civ.Code art. 2315.3. In Cates, supra the definition was used to determine whether an electric company was guilty of wanton negligence. The Cates, supra definition has been applied to an action for punitive damages under La. Civ.Code art. 2315.3 in Griffin, supra; Landry, supra and Lasha, supra. The Griffin, supra court further held at 501 that a plaintiff must prove the misconduct:
was committed with the state of mind that [defendant] knew the public safety was at risk or should have known that it was highly probable that harm to the public would follow as a consequence of its derelictions. In other words plaintiff must show that [defendant's] alleged acts and omissions of negligence were accompanied by a conscious indifference to consequences amounting almost to a willingness that harm to the public safety would follow.
Appellants contend Marathon knew the chemical was hazardous and that they should have known exposure to the atmosphere would not be contained. Thus, Marathon should have known it was highly probable the public would be harmed as a result. They assert it is of no moment that the chemical was in a less concentrated form when it reached the plaintiffs and did not cause them harm from the hazardous nature of the chemical. They rely on the case of Tillman v. CSX Transportation Company, 617 So.2d 46, 48 (La.App. 4th Cir.1993) for the proposition that the intent of the article is to punish *79 the wanton or reckless behavior regardless of whether the substance actually caused the problem. In Tillman, supra at 49 the court explained:
the statute does not say that the injury must have been caused by the exposure to a toxic substance, but that it must have been caused by the defendant's reckless conduct in handling a toxic substance ... Although this accident caused no damages from hazardous or toxic substances, we conclude that a speeding train carrying hazardous or toxic substances is the type of conduct that the statute was designed to protect against.
We have previously held in Broussard v. Rogers, 628 So.2d 1351 (La.App. 5th Cir.1993), writ denied, 94-0113 (La.1/27/95) 649 So.2d 378 that we declined to follow Tillman, supra. In Broussard, supra we addressed the issue of "whether punitive or exemplary damages may be awarded to a plaintiff under La.Civ.Code art. 2315.3 when that plaintiff's injury is not caused by the hazardous or toxic nature of the substance." Id. at 1352. We affirmed the dismissal of a claim based on article 2315.3 when the injury to the plaintiff was not caused by the hazardous or toxic substance. Although the Broussard, supra case involved a motor vehicle accident in which the defendant's truck was in the process of returning from transporting diesel fuel, our interpretation of article 2315.3 applies to the case herein.
On rehearing the Supreme Court modified its original opinion in Billiot, supra and specifically declined to address this issue. Billiot v. B.P. Oil Co., 93-1118 (La.9/29/94) 645 So.2d 604. Although the original opinion held at 617 that the article "clearly does not limit its grant of the right to seek a punitive award only to persons whose injuries are caused by the inherent nature or character of the toxic or hazardous substance," the court modified this section of the opinion at 619 to state it would not address the issue. The court stated at 619:
because the victim in the present case was injured by the toxic substance itself, it is not necessary at this time to decide whether a victim whose injury was not causally related to the hazardous or toxic substance may obtain a punitive award.
Therefore we follow our holding in Broussard, supra.
The Billiot, supra court did, however, explain the burden of proof under article 2315.3 at 613 and relied on Griffin, supra and Cates, supra:
In establishing the separate and distinct right to seek the exemplary or punitive award, however, the introductory clause of Article 2315.3 does not relieve the plaintiff of the burden of proving the basic factual elements of a tort case. To the contrary, Article 2315.3 itself, by its narrow authorization of punitive damages awards under special circumstances, imposes a more onerous proof requirement than plaintiffs face in ordinary negligence cases. In order to obtain an award of exemplary or punitive damages, the plaintiff first must prove that the defendant's conduct was wanton or reckless. In practice, this standard obliges the plaintiff to prove at least that the defendant proceeded in disregard of a high and excessive degree of danger, either known to him or apparent to a reasonable person in his position. Prosser & Keeton, supra, § 34, at 213-14. In other words, the "wanton" or "reckless" conduct that must be proved is highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent. Id. at 214; see also Griffin v. Tenneco Oil Co., 531 So.2d 498, 501 (La. App. 4 Cir.1988) (quoting Cates v. Beauregard Electric Cooperative, Inc., 316 So.2d 907, 918 (La.App. 3 Cir.1975)). Second, the plaintiff must show that the danger created by the defendant's wanton or reckless conduct threatened or endangered the public safety. Third, the statute requires proof that the defendant's wanton or reckless conduct occurred in the storage, handling or transportation of hazardous or toxic substances. Finally, the plaintiff is required to prove that his or her injury was caused by the defendant's wanton or reckless conduct consisting of all of these elements.
*80 Therefore, in order to recover, the plaintiffs "must first prove that the defendant's conduct was wanton or reckless." Id. at 613. The trial judge concluded they failed to meet their burden of proving the conduct was wanton or reckless. We find no manifest error.
The trial judge attached great weight to the testimony of George Lowe, the plant manager in finding that the release of ethyl mercaptan was caused by the negligent planning and/or operation of the employees and that there was no evidence of conduct rising to the level of wantonness or recklessness. His conclusion is supported by the record.
George Lowe testified that at the time of the incident he was division manager at Marathon. He became aware of a problem when he received a call over the emergency radio system about 9:15 a.m. to 9:20 a.m. that day. The call concerned a report by the principal of Garyville Elementary School of an odor. He and Bo Lewis, the emergency coordinator, went to investigate. He did not pick up the odor at the school but noticed it along the River Road. Bill Beachum, the safety supervisor, informed him he thought the problem was at a section of the plant referred to as "North Forty." When Lowe arrived at this section Jim Wilkins, the environmental coordinator, and Beachum were there. They explained the odor was ethyl mercaptan. An investigative team was formed. He stated that the drum was larger than 55 gallons and that if someone let ethyl mercaptan into the atmosphere, there would be a problem with a stinking odor. He explained their investigation disclosed that:
this problem resulted from a communications error or misunderstanding in that one party said I have an empty tank of the ethyl mercaptan injection system that has to be disposed of. The other said, well, I'll look it up in the EPA, and it says an empty tankthis is what you do ... that procedure was followed for an empty tank. [Emphasis added.]
He testified that there was more ethyl mercaptan to dispose of than it was thought. This testimony is corroborated by the testimony of Jennifer Bracey. She testified she is employed by Marathon as a chemical engineer in the environmental department. She was employed in that capacity on the date of the incident. Her duties include hazardous waste disposal.
Marathon uses a waste water treatment disposal system. The sump used on the date of the incident was open to the atmosphere. From the sump the material drains into the oily water waste system. At the time of the incident she was one of the people who made the decision regarding disposal of hazardous materials.
She defined toxicity as a subcategory of hazardous. Toxic is something that fails the TCLP test for toxicity. This test measures the presence of certain chemicals. Hazardous waste is listed as: toxic, flammable, corrosive or reactive by the EPA or the Louisiana Department of Environmental Quality.
Ethyl mercaptan is hazardous because it is flammable but it is only hazardous depending on the quantity. Under the DEQ and the federal regulations if a container is empty, it is not hazardous. For ethyl mercaptan it is empty if there is less than 3% of the substance.
On that date employees were cleaning the tank. She was asked by her supervisor, Terry Soulee, what to do to rinse and dispose of an empty tank. She was told the sight glass was empty. Based on this information she assumed it was empty. The procedure she authorized was based on information the tank was empty. Based on the record, we find no manifest error in the trial judge's failure to award punitive damages.

QUANTUM
Appellants contend the trial judge abused his discretion in determining the award of damages by setting them too low and by relying on outdated cases. The Supreme Court explained the appellate standard of review of a general damage award in Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993):
Our jurisprudence has consistently held that in the assessment of damages, much discretion is left to the judge or jury, and upon appellate review such awards will be disturbed only when there has been a clear *81 abuse of that discretion, Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977). And, "[i]t is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review be considered either excessive or insufficient," Reck v. Stevens, 373 So.2d 498, 501 (La.1979). Appellate courts review the evidence in the light which most favorably supports the judgment to determine whether the trier of fact was clearly wrong in its conclusions. Arceneaux v. Dominque, 365 So.2d 1330 (La.1978). Before an appellate court can disturb the quantum of an award, the record must clearly reveal that the jury abused its discretion. In order to make this determination, the reviewing court looks first to the individual circumstances of the injured plaintiff. Only after analysis of the facts and circumstances peculiar to the particular case and plaintiff may an appellate court conclude that the award is inadequate. See Reck v. Stevens, supra; Cariere v. State Farm Insurance Co., 467 So.2d 867 (La.App. 2d Cir.1985).

Prior awards under similar circumstances serve only as a general guide. If the appellate court determines that an abuse of discretion has been committed, it is then appropriate to resort to a review of prior awards, to determine the appropriate modification of the award. in such review, the test is whether the present award is greatly disproportionate to the mass of past awards for truly similar injuries. See Reck v. Stevens, supra; Wactor v. Pickens Lumber Co., 505 So.2d 815 (La. App. 2d Cir.1987), writ denied, 508 So.2d 827 (La.1987). In instances where the appellate court is compelled to modify awards, the award will only be disturbed to the extent of lowering or raising an award to the highest or lowest point which is reasonably within the discretion afforded the trial court. American Motorist Insurance Company v. American Rent-All, Inc., 579 So.2d 429 (La.1991); Scott v. Hospital Service District No. 1 of the Parish of St. Charles, 496 So.2d 270 (La.1986); Carollo v. Wilson, 353 So.2d 249 (La.1977); Coco v. Winston Industries, Inc., supra. [emphasis added].
In his written reasons for judgment the trial judge reviewed cases involving similar injuries. Appellants argue the trial judge failed to award damages to each plaintiff based upon that plaintiff's particular injuries and chose instead to base the awards on a line of cases between 20 to 50 years old. They state that a review of the cases was not an abuse of discretion but argue that none of the cases was on point with the particular facts of each case. Therefore, appellants' brief next discusses cases relied on by the trial judge and shows factual differences between those and the facts herein.
The trial judge noted in his reasons for judgment that:
This cited line of cases gives the Court some direction with regard to the appropriateness of damage wards for injuries sustained by the bellwether plaintiffs in this case. The damages awarded in cases cited are for exposures over a longer period of time than the Mercaptan gas release in this case. Normally the damage awards would be discounted proportionally for the period of exposure. However, the line of cases cited are twenty (20) to fifty (50) years old. The Court concludes that any discounting for the duration of exposure would be offset by an appropriate adjustment upward of the damages to present day values.

The Court will analyze each bellwether plaintiff with regard to the issue of causation and general damages given their individual facts and award damages where warranted in accordance with the quantum analysis cited [emphasis added.]
Appellants contend it was an abuse of discretion for the trial judge to rely on these outdated cases and to declare that the difference in today's dollars would be offset by the shorter duration of exposure. They also argue that the trial judge did not take into account that by today's standards the fear of contracting a life-threatening disease is more common than it was previously.
In reviewing the entire reasons given by the trial judge, we are convinced that he did consider the particular factual circumstances of each case and was not attempting to solely *82 award damages based on a specific line of cases. He first reviewed a line of cases involving similar damages and indicated that this line of cases gave him "some direction with regard to the appropriateness of damage awards for injuries sustained by the bellwether plaintiffs in this case." His description of the cases reviewed indicates he was mindful of whether the awards had been affirmed on appeal. Thus, he only used the cases as a guide. He then explained he would analyze each plaintiff given their individual facts. The trial judge gave specific factual findings relative to each plaintiff. Additionally, he considered an award for psychic trauma. However, he explained:
With regard to the bellwether plaintiffs only one (1) THERESA WASHINGTON, sought medical treatment. No bellwether plaintiff sought treatment for psychic trauma. The record shows no independent testimony concerning the extent of any mental anguish which plaintiffs may have received. The trial record, in fact, suggest[sic] that any mental anguish suffered by bellwether plaintiffs abated relatively soon after the incident. There is no evidence in the record that bellwether plaintiffs suffered from any residual or continuing psychic or physical injuries as a result of the alleged distress. Nevertheless the trial record does support that bellwether plaintiffs did suffer some physical discomfort and/or mental anguish from the incident.
His factual findings stated above are supported by the record. Furthermore, his findings regarding each of the plaintiffs are also supported by the record. Applying the standard of review enunciated in Theriot, supra. and the cases cited therein, we find no abuse of the trial judge's discretion.
The trial judge correctly found that only Theresa Thomas Washington sought medical attention. He was also correct in noting that she was treated summarily and required no further medical treatment for her symptoms of vomiting and dizziness. He correctly characterized the symptoms reported by the plaintiffs as mild.
Dr. William J. George testified as an expert in toxicology. He testified that if someone is exposed to one part per billion of ethyl mercaptan there is no adverse effect but only the recognition of an odor. He stated that with a concentration of 50 to 500 parts per billion of ethyl mercaptan there were no adverse effects in almost all individuals. Although it is possible for someone to be affected, it is not likely. He noted that at 4,000 parts per billion symptoms of membrane irritation, fatigue and nausea become evident.
Dr. Bruce Turner, an expert in the field of air modeling, testified he used the meteorological data on the date of the incident, the testimony of fact witnesses, and reports filed by Marathon with the Department of Environmental Quality to develop various diagrams of the path for the plume of ethyl mercaptan. His model gave estimated concentrations of the substance. He noted the highest concentration of ethyl mercaptan would be the area at the plant, around the sump at the time of its release. The concentration at this location was calculated to be less than 500 parts per billion. Additionally, there were no indications of concentrations above 50 parts per billion off Marathon's property.
Frances E. Courtney testified as an expert in air modeling, air science, and meteorology. He testified he developed an air model of the incident based on meteorological data. He also relied on Marathon data indicating 10 pounds of ethyl mercaptan was released and vaporized. He stated that there was no indication the concentration of ethyl mercaptan outside the plant exceeded 500 parts per billion.
It is clear from our review of the record that the trial judge carefully considered the testimony of the witnesses and did not rely on a line of cases for determining the actual damage award granted.
Accordingly, for the reasons stated, the judgment is affirmed at appellants' cost.
AFFIRMED.
NOTES
[1] The claims of three parties were dismissed for failure to appear at trial; these claimants were awarded $0.
[2] The cause of action in this case arose on August 22, 1991. La. Civ.Code art. 2315.3 was repealed in 1996 by Act 2 of the 1996 Extraordinary Session. However, section 2 of the act provides that "The provisions of this Act shall only be applicable to causes of action which arise on or after the effective date hereof." Thus, the applicable law is former La.Civ.Code art. 2315.3 which provides:

In addition to general and special damages, exemplary damages may be awarded, if it is proved that plaintiff's injuries were caused by the defendant's wanton or reckless disregard for public safety in the storage, handling, or transportation of hazardous or toxic substances. As used in this Article, the term hazardous or toxic substances shall not include electricity.
[3] Uniform RulesCourts of Appeal Rule 2-12.4 provides: "The court may consider as abandoned any specification or assignment of error which has not been briefed."