664 So.2d 503 (1995)
Don MILTON
v.
ELMWOOD CARE, INC., Larry McFall, Phil Sanderson, J. Thomas Martin and Pat Patterson.
No. 95-CA-442.
Court of Appeal of Louisiana, Fifth Circuit.
October 31, 1995.
Order Clarifying Decision on Limited Grant of Rehearing December 18, 1995.
Boolus J. Boohacker, Baton Rouge, for Plaintiff-Appellant Don Milton.
William M. Lucas, Jr., Sharon Cormack Mize, New Orleans, for Defendants-Appellees Elmwood Care, Inc., Larry McFall, Phil Sanderson and Pat Patterson.
Daniel A. Ranson, Gretna, for Defendant-Appellee Paracelsus Elmwood Medical Center, Inc.
Before GAUDIN, DUFRESNE and CANNELLA, JJ.
CANNELLA, Judge.
Plaintiff, Don Milton, appeals from a judgment in favor of defendants, Elmwood Care Inc. (ECI), Medical Venture Management, Inc. (MVM), Larry McFall, Phil Sanderson and Pat Patterson,[1] dismissing his case *504 against them. For the reasons which follow, we affirm.
The facts giving rise to this controversy, as pertains to the issues before us on appeal, are capably set out in great detail by the trial court, as follows. In mid-1989, defendants McFall and Sanderson became interested in acquiring Elmwood Medical Center (EMC), located in Jefferson, Louisiana, from Healthcare International, Inc. (HII). They began seeking a source of financing for the purchase of the hospital, attached medical office building and garage.
From August through December 1989, McFall and Sanderson worked exclusively and extensively with J.C. Bradford & Company on a proposal to finance the purchase of the hospital through the issuance of bonds. McFall contacted Martin in connection with conventional financing. Martin introduced McFall and Sanderson to Milton, who contacted a broker in Atlanta, Georgia. The broker in turn contacted American Health Properties ("AHP"), which eventually provided the financing for the entire project.
During the pre-incorporation phase, it was understood and agreed that Martin and Milton would only participate if Martin and Milton found a source of conventional financing and if McFall and Sanderson, in their sole discretion, decided to use conventional financing. In that event, the hospital would be managed by MVM, a corporation owned by McFall, Sanderson and Patterson. However, if McFall and Sanderson decided to finance the acquisition through the issuance of bonds, then Martin and Milton would not participate.
Because it was understood and agreed that Patterson would participate after his employment with HII ended in late 1990, it was initially agreed that the five shareholders would each own twenty percent. During negotiations, however, AHP imposed a requirement that McFall and Sanderson together own a majority of ECI's stock. Greg Schonert, vice-president of AHP, testified that AHP wanted to be assured that McFall and Sanderson, who had years of experience in the hospital industry, would always be in control of ECI and the management of the hospital.
AHP's requirement necessitated a reduction in the percentages of the other three shareholders. McFall told Martin that unless Martin and Milton agreed to a five percent reduction from twenty to fifteen percent, McFall and Sanderson would abandon the AHP proposal and would pursue the J.C. Bradford proposal. Based upon Martin's and Milton's agreement to a five percent reduction, McFall and Sanderson agreed to pursue the AHP proposal and to abandon the J.C. Bradford proposal.
ECI was incorporated in Delaware in early 1990. Initially, McFall and Sanderson each owned thirty-five percent of the stock and Martin and Milton each fifteen percent. In September 1990 McFall and Sanderson each transferred nine percent to Patterson. Neither McFall, Sanderson nor Patterson ever individually owned fifty-one percent of the stock.
In May 1990 ECI purchased EMC's working capital and movable property and assumed certain liabilities. AHP of New Orleans, Inc., a subsidiary of AHP, purchased the land and buildings and leased them to ECI.
MVM managed the hospital pursuant to the Management Agreement between ECI and MVM. ECI's Board of Directors, including Milton, unanimously approved and adopted the Management Agreement. ECI paid MVM an annual fee of $500,000 for the services rendered and expenses incurred by McFall, Sanderson and Patterson pursuant to the Management Agreement.
When the financial statements for December 31, 1990 were being prepared, ECI reclassified the amounts paid to MVM on the basis of tax advice. In order to satisfy its auditors, ECI's directors rescinded the Management Agreement and reclassified the amounts paid to MVM as shareholder distributions. ECI's directors later reinstated the Management Agreement retroactively.
*505 In early 1991, the hospital's controller, Jerry Barron, resigned. His assistant, Joe Butzman, C.P.A., was promoted to controller based on his job performance and references.
In October 1991 AHP reported to Sanderson that it had not received the October lease payment. Sanderson made inquires, and Butzman provided a plausible explanation that the bank and Federal Reserve had made an arithmetical error in wiring the funds to AHP. The correct amount was immediately sent to AHP. In November, when AHP again reported to Sanderson that it had not received the lease payment, it was discovered that Butzman had falsified monthly financial statements, payroll tax reports and various other accounting records. Butzman's employment was immediately terminated.
ECI filed and prepared amended payroll tax reports. After investigation, both the Internal Revenue Service and the Louisiana Department of Revenue and Taxation found that ECI was not at fault and waived penalties of approximately $150,000.
The hospital auditors, Ernst & Young, were engaged to determine if there had been any unauthorized case disbursements or diversion of ECI funds. No evidence of such disbursements or diversions was found. Two private investigators reached the same conclusion. At the request of Alerion Bank, ECI's lender for its line of credit, an auditing firm was engaged to review the hospital's internal controls. The auditors found no material weaknesses in the hospital's internal control system.
Due primarily to undercapitalization and the death of the hospital's primary admitting physician, the hospital began experiencing financial problems. When Alerion Bank did not renew its line of credit in mid-1992, ECI was unable to secure satisfactory alternative financing. Barclay's Bank put ECI in touch with Paracelsus' parent company, which expressed an interest in buying the hospital.
Negotiations between the parties ensued. At the beginning of the negotiations, Paracelsus offered MVM $800,000 to cancel the Management Agreement between MVM and ECI. MVM declined the offer, agreed to voluntarily cancel the Management Agreement, and requested that the $800,000 be included in the sales proceeds paid to ECI. Paracelsus agreed and the $800,000 was added to the sales price. Both McFall, who negotiated for ECI, and Joyner, who negotiated for Paracelsus, testified that both parties negotiated a reasonable and fair sales price on the basis of the hospital's cash flow, an accepted method of valuing a business.
ECI noticed a directors' and shareholders' meeting for Saturday, February 27, 1993 in Nashville, Tennessee to consider the sale of the hospital to Paracelsus. Despite receiving the notice of the shareholders' meeting, Milton declined to personally attend. Instead, he sent two of his attorneys to Nashville on his behalf.
The sale was approved by seventy-five percent of the board of directors and by seventy percent of the shareholders' total voting power (one hundred percent of the voting power present at the shareholders' meeting). The sale closed on March 1, 1993. A portion of the sales proceeds was deposited in an escrow account in Nations Bank in Nashville, Tennessee. ECI received most of the sales proceeds in cash and immediately distributed the funds to its shareholders according to their percentage interest. Milton's fifteen percent of the closing proceeds, $277,959.92, was wired to his attorneys' trust account upon Milton's express instructions.
During the negotiations for the sale of the hospital, Paracelsus stated its desire to have available the experience and talent of McFall, Sanderson and Patterson to assist in the future development of the hospital. The parties initially discussed a Consulting Agreement between Paracelsus and MVM. When Milton objected to such an Agreement between Paracelsus and MVM, Paracelsus entered into a five-year Consulting Agreement with ECI. Under the Consulting Agreement, ECI agreed to assist Paracelsus in the long-range development of the hospital and agreed not to compete. ECI's compensation under the Consulting Agreement is based on the future cash flow of the hospital. If the hospital's future cash flow exceeds 1992's cash flow, ECI receives the first $500,000, Paracelsus retains the next $1.7 million, and ECI receives a percentage of any excess over *506 $2.2 million. In 1993, ECI received an advance of $250,000 under the Consulting Agreement.
In the year between the sale and the trial, ECI fulfilled its obligations under the Consulting Agreement through the efforts of McFall, Sanderson, and Patterson. McFall and Patterson spent more than four hundred hours in negotiating the purchase of the only real estate adjacent to the hospital and available for hospital expansion. McFall, Sanderson and Patterson, on behalf of ECI, prepared and submitted to Paracelsus a detailed plan of long-range development for the hospital. McFall, Sanderson, and Patterson serve on the board of directors of Paracelsus.
Between the sale and the trial, McFall, Sanderson, and Patterson also worked on other ECI matters, namely: assisting the auditors in performing the 1992 audit and preparing the 1992 income tax returns; preparing four cost reports for Medicare and Medicaid reimbursements; "winding up" ECI's self-funded medical benefit plan for hospital employees; reviewing accounts, disbursing funds and keeping records for the accounts payable not assumed by Paracelsus; monitoring and assisting with collection of accounts receivable in order to maximize the sales proceeds to ECI; prosecuting a claim for refund of sales taxes; and prosecuting and defending medical malpractice, commercial and collection lawsuits.
Between the sale and trial, McFall, Sanderson and Patterson drew from ECI a total of $18,000 each as compensation.
On April 9, 1992, Milton, a fifteen percent shareholder in ECI, filed his original petition and thereafter filed several amended petitions. He alleged, among other things, that McFall, Sanderson and Patterson breached their fiduciary duty to him and to the corporation, causing a reduction in the value of his stock. Milton sought monetary damages as well as rescission of the sale of ECI's assets to Paracelsus and requested that he be appointed receiver of ECI.
Prior to trial, the trial court granted motions for summary judgment and dismissed J. Thomas Martin and AHP of New Orleans, Inc., from the lawsuit. The trial court also granted an exception of no cause of action in favor of Paracelsus and dismissed them. The case was tried against the remaining defendants on March 14 to 17, 1994. At the close of Milton's case, the court granted an involuntary dismissal against Gerald Parton and took the remainder of the case under advisement.
On May 18, 1994, the trial court rendered judgment dismissing Milton's claims against McFall, Sanderson, Patterson, ECI and MVM. The court denied the appointment of a receiver and assessed costs against Milton. It is from this judgment that Milton appeals.
Milton assigns two errors on appeal which are interrelated. He argues that MVM breached its management agreement with ECI which resulted in losses to the company and, in turn, McFall, Sanderson and Patterson breached their fiduciary duties to him and ECI by maintaining the management contract with MVM. Milton argues on appeal that the trial court was clearly wrong in not making those findings and awarding him appropriate monetary damages. We do not find manifest error in the trial court judgment.
It is well settled that, on appellate review of a factual determination, the reviewing court may not set aside the factfinder's findings of fact in the absence of manifest error or unless they are clearly wrong. Also, where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring, 283 So.2d 716 La.1973). The issue to be resolved by the reviewing court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Stobart v. State through DOTD, 617 So.2d 880 (La. 1993). Thus, where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart, supra.
*507 First, and most significantly, the record indicates that the management contract entered into between ECI and MVM was unanimously agreed upon by all shareholders of ECI, including Milton. Indeed, as part of the pre-incorporation negotiations, different methods were considered by the parties concerning the payment of additional fees to McFall, Sanderson and Patterson since they would be the ones actually managing the hospital. It was decided between the parties that if Milton and Martin became partners in the business venture, then a management contract would be established between the corporation and MVM, operated by McFall, Sanderson and Patterson, to facilitate payment of the extra sums to the individuals who were actually doing the work. The fee was set out in the management agreement and, as stated above, agreed to by Milton. Thus, at the outset, we note that the very contract which Milton complains of now, was approved by him at the inception of this arrangement between the parties.
Milton attacks the management agreement by arguing that MVM breached the agreement by not adequately performing the services agreed upon. The thrust of Milton's argument on this point centers around the problems that developed with the controller, Joe Butzman. Milton argues that MVM breached its management contract with ECI by hiring someone who was not capable of performing the job.
In early 1991 the hospital's controller, Barron, resigned to take another position. His successor, hired by MVM, was Butzman, who had been serving as the assistant controller. He had worked as assistant controller under Barron at another hospital. When Barron and Gerald Parton, the hospital administrator, left that hospital for employment with EMC, they recruited Butzman to join them. His former employer, a C.P.A. firm, gave him a good reference. MVM had no information that would have cast doubt on Butzman's integrity or his abilities.
Milton relies on the testimony of Ron Updegraff, from the Ernst and Young accounting firm, in support of his mismanagement arguments. However, much of his testimony was contradicted by other witnesses.
Updegraff testified that in his opinion Butzman was unable to perform his duties as controller. In hindsight, no one disputes the fact that Butzman could not perform his job. However, in 1990, when he was elevated to the position of controller from assistant controller, MVM had every reason to believe that he could ably perform the job. Although Updegraff stated that it was early 1991 when he expressed to ECI that Butzman could not perform his job, Sanderson testified that it was late 1991 when Updegraff expressed this opinion. Updegraff was critical of the hospital's internal controls. However, the record bears out the fact that the controls were in place and working and that Butzman simply circumvented the internal control system. Ernst & Young performed the 1990 audit but did not issue any formal internal control letter at that time. After Alerion Bank, the lender for ECI's line of credit, requested that ECI hire an independent auditor to review the hospital's internal controls, no material weaknesses were found.
In October 1991, AHP reported to Sanderson that it had not received the October lease payment. Sanderson made inquiry and Butzman provided a plausible explanation. The correct amount was immediately sent. Just one month later, after AHP reported that it had not received the November lease payment, it was discovered that Butzman had falsified monthly financial statements, payroll tax reports, and various other accounting records. Butzman's employment was immediately terminated. Ernst & Young were engaged to determine if there had been any unauthorized cash disbursements or diversions of hospital funds and found no evidence of such disbursements or diversions. A former FBI agent and another C.P.A. were also employed to investigate the matter and neither found any evidence of a diversion of hospital funds by or to any person.
Milton also points to the decline in hospital profits as an example of the MVM's breach of its management contract with ECI. However, evidence was offered indicating that the decline in hospital revenue had to do with the death of the major admitting physician and undercapitalization of the venture rather *508 than improper management. In fact, when EMC's assets were later sold to Paracelsus, McFall, Sanderson and Patterson were retained to assist with the hospital management.
After reviewing the record, we acknowledge that conflicting evidence was presented as to whether MVM performed its managerial tasks adequately. However, we do not find that the trial court's credibility evaluations were unreasonable or that the court's findings of fact were manifestly erroneous. The record amply supports the trial court finding that MVM did not breach its management contract with ECI.
Milton, a minority shareholder in ECI, also argues that defendants breached their fiduciary duties to him. This argument largely rests on the contention that MVM breached its management contract with ECI and that McFall, Sanderson and Patterson did nothing to terminate the contract with MVM. On this point, we have already determined that there was no breach of the management agreement between MVM and ECI.
Milton also complains that the management agreement was rescinded in April of 1991 and then reinstated in March of 1992 without shareholder approval, indicating the breach of fiduciary duties by McFall, Sanderson and Patterson. Milton fails to allege or show any detriment he suffered as a result of these actions. Defendants did not act contrary to Milton's expressed intentions. He, from the beginning, agreed to the contract between ECI and MVM. It was unanimously agreed upon. The management agreement was part of the arrangements between the parties from the outset, to compensate McFall, Sanderson and Patterson for their hands on efforts in operating the hospital. For example, the record shows that only the names of McFall, Sanderson and Patterson appear on the guaranty agreement with Alerion Bank, for the $3,500,000 line of credit extended to the hospital. Thereafter, for accounting purposes to gain favorable tax consequences, the contract with MVM was rescinded and then later reinstated. This is the same contract originally agreed to by Milton.
Milton also presents examples of several alleged instances in the negotiations with Paracelsus where McFall, Sanderson and Patterson seemed to be self dealing rather than negotiating for the benefit of ECI. However, Milton does not allege any adverse consequences to these alleged attempts at self dealing. In fact, the sale to Paracelsus did take place, at fair value, and the funds to buy out the MVM contract were paid to ECI as part of the sales price and disbursed to the shareholders, including Milton. ECI maintains an ongoing management contract with Paracelsus which provides, in addition to the fee, opportunities to share in the hospital profits. Milton, as a share holder of ECI is a beneficiary of this contract.
Therefore, since there was no breach of the agreement between MVM and ECI, and Milton himself approved the management contract, which was to facilitate the agreement between the parties that McFall, Sanderson and Patterson were to receive additional fees for their services, we find no error in the trial court's finding that defendants did not breach their fiduciary duties to Milton.
Accordingly, for the reasons stated above, the judgment of the trial court is affirmed and Milton is assessed for costs of appeal.
AFFIRMED.

REHEARING GRANTED.
Upon application by Paracelsus, we grant a rehearing for the limited purpose of clarifying that Milton's appeal of the March 10, 1994 judgment, granting Paracelsus' exceptions of prescription and no cause of action, has been abandoned because it was neither briefed nor argued in this court. Rivnor Properties v. Herbert O'Donnell, Inc., 92-1103 (La.App. 5th Cir. 1/12/94), 633 So.2d 735.
NOTES
[1] Other defendants, American Health Properties (AHP), Paracelsus Elmwood Medical Center, Inc. (Paracelsus), Gerald Parton and J. Thomas Martin, were initially named in the case, but were dismissed prior to the May 18, 1994 judgment which is the subject of this appeal.