897 So.2d 768 (2005)
Donna HOWARD, Individually and on Behalf of Her Two Minor Children, Chad Howard and Kendra Howard, Clarence Johnson, Joyce Johnson, Orville Johnson and Helen Johnson
v.
UNION CARBIDE CORPORATION.
No. 04-CA-1035.
Court of Appeal of Louisiana, Fifth Circuit.
February 15, 2005.
*770 Andrew A. Lemmon, Hahnville, LA, Roy F. Amedee, Jr., Kenner, LA, A.J. Rebennack, Metairie, LA, for Plaintiff/Appellee.
Edward J. Laperouse, II, Gregory E. Bodin, Baton Rouge, LA, for Defendant/Appellant.
Panel composed of Judges THOMAS F. DALEY, MARION F. EDWARDS and WALTER J. ROTHSCHILD.
WALTER J. ROTHSCHILD, Judge.
This is an appeal from a judgment of the trial court granting class certification. For the reasons stated more fully herein, we affirm the ruling of the trial court.

Facts and Procedural History
On September 10 and 11, 1998, the floating roof lid on Tank 3100, which stored liquid naphtha at the Union Carbide Corporation's plant facility in Taft, Louisiana, partially collapsed due to excessive amount of rain water that was deposited there by a tropical storm. As a result of this collapse, a quantity of naphtha escaped from the tank and was converted to an airborne vapor. The vapor traveled to nearby areas until the substance was contained by defendants approximately 17 hours after the initial incident by covering the exposed chemical with foam.
On September 15, 1998, plaintiffs filed this class action petition for injuries and damages sustained as a result of a release of naphtha gas and benzene from the Union Carbide Plant in St. Charles Parish. On December 4, 1998, plaintiffs filed a motion to certify the action as a class. A class certification hearing was held from August 5-8, 2002, and was continued by the taking of several depositions of expert witnesses in April of 2003.
By judgment rendered on April 4, 2004, the trial court certified the class action as follows:
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the class is defined as those persons living or located between the Union Carbide Plant and the towns of Taft and Killona, including the towns of Taft and Killona, and the residents of the town of Montz, who were present in these locations for some time, from 10:00 p.m. on September 10, 1998 until 3:00 on September 11, 1998, and who experienced the physical symptoms which include any or all of the following  eyes, nose, or throat irritation, coughing, choking or gagging, or nausea, as a result of their exposure to naphtha or other chemical substance release from Union Carbide. Those persons living or located in those geographic areas and who experienced any of these physical symptoms will constitute the class and will be bound by the decision in this case.
*771 Defendant, UCC, contends by this appeal that the trial court erred in its certification of this matter as a class action. Plaintiffs have answered the appeal.

Applicable Law
The judgment certifying the class in this action is appealable. Eastin v. Entergy Corp., 97-1094 (La.App. 5 Cir. 4/15/98), 710 So.2d 835. In Louisiana, the class action procedure is governed by the provisions of La.C.C.P. art. 591, et seq.
Under Louisiana law, a class action may be certified only if the numerosity, typicality, adequacy of representation, and commonality requirements are present. Billieson v. City of New Orleans, 98-1232 (La.App. 4 Cir. 3/3/99), 729 So.2d 146, 154, writ denied, 00-946 (La.10/29/99), 749 So.2d 644 and writ denied, 99-960 (La.10/29/99), 749 So.2d 645. The burden of establishing that the statutory criteria are met falls on the party seeking to maintain the class action. Id.; Cooper v. City of New Orleans 01-115 (La.App. 4 Cir. 2/14/01), 780 So.2d 1158, writ denied, 01-720 (La. 5/11/01), 792 So.2d 734. In order to meet class certification requirements, plaintiff must meet all of the requirements of La. C.C.P. art. 591(A) and fall within one of the sections of art. 591(B).
A trial court has great discretion in deciding whether to certify a class, and its decision will not be overturned absent manifest error. Adams v. CSX Railroads, 92-1077 (La.App. 4 Cir. 2/26/93), 615 So.2d 476. Any errors to be made in deciding class action issues should be in favor of and not against the maintenance of the class action, because a class certification order is subject to modification if later developments during the course of the trial so require. McCastle v. Rollins Environmental Services of Louisiana, Inc., 456 So.2d 612 (La.1984).
The purpose and intent of a class action procedure is to adjudicate and obtain res judicata effect on all common issues applicable not only to the class representatives who bring the action, but to all others who are similarly situated, provided they are given adequate notice of the pending class action and do not timely exercise their option of exclusion. Doerr v. Mobil Oil Corp., 01-775 (La.App. 4 Cir. 2/27/02), 811 So.2d 1135, 1141, writ denied, 02-920 (La.5/31/02), 817 So.2d 105 and writ denied, 02-938 (La.5/31/02), 817 So.2d 106.
In reviewing the trial court's ruling on appeal, this Court is not called upon to review whether plaintiff will ultimately prevail on the merits, nor can this court review plaintiff's claims on their substantive merit. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); Duhe v. Texaco, Inc., 99-2002 (La.App. 3 Cir. 2/7/01), 779 So.2d 1070, 1078, writ denied, 01-637 (La.4/27/01), 791 So.2d 637. Rather, the task presented to this court is to determine whether the certification of this action as a class is appropriate in light of Louisiana's established criteria. Nevertheless, an examination of plaintiff's substantive legal claims is necessary to make a determination of whether certification of a class action is appropriate in this case.

Defendant's Appeal
Union Carbide Corporation (UCC) contends that the trial court abused its discretion in certifying this cause as a class action because numerosity and typicality as required by La. C.C.P. art. 591(A) are not present in this case. Specifically, UCC contends that plaintiffs failed to meet their burden of establishing by a preponderance of the evidence that (1) the number of persons comprising the class warrants the existence of the class in the first place; and (2) the claims of the proposed class *772 representatives are typical of the class as a whole.
UCC argues that the expert testimony presented at trial shows that the levels of airborne naphtha on the date of the incident did not reach levels which would cause the irritant symptoms described by plaintiffs in their petition for damages. Thus, UCC contends that plaintiffs failed to meet their burden of proving that a large number of individuals necessary to sustain a class action sustained injury as a result of the release of naphtha gas from Tank 3100.
In support of this position, defendant relies on the testimony of its air modeling expert, John Woodward, who opined that the amount of naphtha lost from the tank during the initial 17 hour period was approximately 3% of its contents. Assuming 25% coverage of liquid naphtha on the roof of the tank, the concentration level of the naphtha gas which would have reached the towns of Killona and Montz would have been 6 parts per million ("ppm"). Dr. Woodward further stated that even assuming there was 100% coverage of the tank lid as contended by plaintiffs, the concentration level of the gas in those areas would have been 24 ppm.
Defendant further relies on the testimony of Dr. Stanley Haimes, who was tendered as an expert in industrial hygiene. Dr. Haimes stated that, on average, a person would only begin to experience irritant symptoms from being exposed to naphtha when the airborne concentration of the gas reaches 880 ppm. However, he stated that the odor threshold of naphtha gas was less than 1 ppm. He also calculated that according to federal workplace standards, there would be a level of concern for workers who were exposed to naphtha vapors at a concentration level 33 ppm. Relying on Dr. Woodward's air modeling figures, Dr. Haimes was of the opinion that the majority of individuals exposed to naphtha gas on September 10 and 11, 1998 would not have experienced irritating symptoms, such as burning eyes and throat, coughing or nausea.
Plaintiffs submitted the testimony of Dr. Vasilis Fthenakis, who was accepted by the court in the field of chemical engineering and chemical air dispersion modeling. Dr. Fthenakis stated that his findings indicated that 11% of the contents of the tank were emitted over the 17 hour period that it was not contained. He further found that the concentration level of naphtha gas at the outer most points of the plume was 35 parts per million. Dr. Fthenakis bases this finding on his determination that due to the strong winds and heavy rains, the entire roof of the tank would have been covered in liquid naphtha, and this would have increased the concentration level when the liquid evaporated.
Further, plaintiffs submitted the testimony of Dr. William Nassetta, an expert in the field of occupational medicine. Dr. Nassetta stated that he examined the evidence in this case to determine the effects of the emission of naphtha gas. Dr. Nassetta noted that there is nothing in the literature about the particular type of naphtha involved in this case, and that the studies he conducted were comparative. He stated he relied on the reports of Dr. Fthenakis and Dr. Craig, and he found that at concentration levels of 58 ppm, most individuals could avoid physical effects from the gas for a two hour period. He also found that at concentration levels of 38 ppm, most individuals could avoid physical effects for a period of three hours.
Dr. Nassetta testified on cross-examination that irritant effects from exposure to this gas in most individuals, i.e., coughing, burning eyes and throat, would not have occurred until the concentration level *773 reached 100 ppm, although the level of concern exists at 38 ppm. However, Dr. Nassetta further stated that the symptoms will increase as the levels of concentration or length of exposure to the gas increases, and he noted that the event in this case lasted for 17 hours until the substance was contained, with smaller exposures occurring in the hours and days following containment.
The record in this case contains conflicting expert opinions as to the concentration level of naphtha in the atmosphere at the time of this incident. The testimony regarding the level at which individuals would begin to experience irritating effects is also conflicting, and there was testimony that there are differences among individuals as to what concentration level will cause irritant effects. However, the expert testimony from both plaintiffs and defendant indicates that there would be a level of concern at concentration levels of 33-38 ppm. The level of concern was defined by Dr. Nassetta as "where you begin to become concerned that a normal population or a particularly susceptible population may begin to experience some problems that may include irritation." Further, the record clearly shows that the areas certified in the class action sustained a concentration level of at least 35 ppm.
Additionally, the record contains the testimony of the proposed class representatives, who each testified that they were in the area which was certified as part of the class on September 10 and 11, 1998. Each of these individuals testified that they detected an odor in the atmosphere, and that they experienced nausea, headaches, burning eyes and throat and coughing in the hours and days after the initial event. These are the physical symptoms which the expert testimony establishes is typical for exposure to this type of chemical. In addition, plaintiffs submitted the names and addresses of several thousand individuals who plaintiffs allege experienced similar problems and made claims through attorneys on the plaintiffs' committee, evidence when coupled with the expert testimony submitted by plaintiffs, provides a reasonable basis for a finding that joinder of these numerous claims would be impractical.
The trial court heard the testimony of these witnesses, viewed their demeanor and was in the best position to assess the credibility of the witnesses' opinions. The trial court apparently chose to credit the testimony of plaintiffs' class representatives and their experts over the testimony of the witnesses presented by defendant. Appellate review of a trial court's factual findings is limited to a determination of whether the record contains a reasonable factual basis for the trier of fact's findings. Richardson v. American Cyanamid Company, 99-675 (La.App. 5 Cir. 1/29/00), 757 So.2d 135, 143, writ denied, 00-921 (La.5/12/00), 761 So.2d 1291, citing Rosell v. ESCO, 549 So.2d 840 (La.1989).
We have carefully reviewed the entire record in this case, including several volumes of testimony and numerous exhibits. The record, when viewed in its entirety, shows a reasonable factual basis for the trial court's findings that the requirements of La. C.C.P. art. 591 have been met, and that a class action is appropriate in this case. We are therefore unable to conclude that the trial court's determination to certify this action as a class was manifestly erroneous.

Plaintiffs' Appeal
Following the lodging of the record in this Court, plaintiffs filed an answer to the defendant's appeal on the basis that the trial court improperly ruled that plaintiffs "must prove physical injuries in order to recover for fear and fright *774 [damages] and improperly limited the geographic boundaries of the class." However, plaintiffs failed to address in brief its claim that the trial court limited the geographic boundaries of the class, and this issue will be deemed as abandoned. Uniform Rules  Courts of Appeal Rule 2-12.4; Milton v. Elmwood Care, Inc. 95-442 (La.App. 5th Cir.10/31/95) 664 So.2d 503, 508. We will address plaintiffs' argument that the trial court erred in ruling that plaintiffs must prove physical injuries in order to recover damages for mental anguish.
Plaintiffs contend that predictable fear and fright is a compensable injury under Louisiana law, citing Adams v. Marathon Oil Co., 96-693 (La.App. 5 Cir. 1/15/97), 688 So.2d 75 and Rivera v. United Gas Pipeline Co., 96-502 (La.App. 5 Cir. 6/30/97), 697 So.2d 327, writs denied, XX-XXXX-XXXX (La.12/12/97), 704 So.2d 1196-97. However, in the Adams case there is no indication that compensatory damages were awarded for plaintiffs' mental anguish absent any type of physical injury. Additionally, in the Rivera case, the court discussed mental anguish damages as follows:
There is no question that Louisiana law permits a plaintiff to recover for any physical injury suffered as the result of the negligence of another. In addition, in certain circumstances, a plaintiff may recover for fear and mental anguish sustained while a traumatic ordeal is in progress, regardless of whether the plaintiff sustained physical injury. However "to recover for such mental anguish, ... an individual must show that he was involved in a hazardous situation  that is, within the zone of danger  and that his fear was reasonable given the circumstances." More than minimal inconvenience and worry must be shown before damages may be awarded.

Rivera v. United Gas Pipeline Co., supra, 697 So.2d at 337-38. (Citations omitted.)
Further, the Louisiana Supreme Court has expressly held that in order for plaintiffs to recover emotional distress damages in the absence of a manifest physical injury, they must prove their claim is not spurious by showing a particular likelihood of genuine and serious mental distress arising from special circumstances. Bonnette v. Conoco, 02-1767 (La.1/28/03), 837 So.2d 1219, 1235, citing Moresi v. State, Dept. of Wildlife & Fisheries, 567 So.2d 1081 (La.1990). In Moresi, the court held that a defendant will generally not be held liable where his conduct is merely negligent and causes only emotional injury unaccompanied by physical injury.
In the present case, each of the plaintiffs who testified at trial expressed a generalized fear of the harmful effects of the exposure to the naphtha emission, but they failed to prove they suffered genuine and serious mental distress arising from such emissions. Except for one of the plaintiffs who sought medical treatment due to a pre-existing heart condition, none of the plaintiffs sought medical treatment for their alleged physical concerns to their exposure to the chemical. Although plaintiffs presented the expert testimony of Dr. Chester Scrignar who was qualified in the field of psychiatry, Dr. Scrignar only examined two of the plaintiffs prior to trial and his testimony only related the possibility of generalized fear and fright damages. Further, Dr. Scrignar stated he was unable to tell how many individuals comprising the proposed class experienced mental distress as a result of the emission of naphtha gas.
Under these circumstances, we cannot say that plaintiffs met their burden of proving they suffered from genuine and *775 serious mental distress that serves as a guarantee that their claim for mental distress damages is not spurious. Accordingly, we conclude that the trial court did not err in limiting the class certification order to include those plaintiffs who suffered from physical injuries as a result of the emission of naphtha gas.

Conclusion
Accordingly, for the reasons assigned herein, the judgment of the trial court certifying this action as a class is affirmed.
AFFIRMED.